UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

C.L.G. a minor, by AMBER GAMBLE,

                    Plaintiff,                5:14-CV-1308
                                            (GTS/WBC)
v.

COMMISSIONER OF SOCIAL SECURITY

                    Defendant.
_____

APPEARANCES:                        OF COUNSEL:

OLINSKY LAW GROUP             HOWARD D. OLINSKY, ESQ.
  Counsel for Plaintiff
55 Colvin Ave.
Albany, NY 12206

U.S. SOCIAL SECURITY ADMIN.      SIXTINA FERNANDEZ, ESQ.
OFFICE OF REG'L GEN. COUNSEL-REGION II
  Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278

William B. Mitchell Carter, U.S. Magistrate Judge,

## REPORT and RECOMMENDATION

      This matter was referred for report and recommendation by the Honorable Judge

Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local

Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General

Order 18.

      Currently before the Court, in this Social Security action filed by Amber Gamble

on behalf of her minor daughter, C.L.G. ("Plaintiff") against the Commissioner of Social

Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. § 405(g), are the

parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 17, 18.) For the reasons set forth below, it is recommended that Plaintiff's motion be denied and Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

C.L.G. was born on January 29, 2004. (T. 236.) At the time of her hearing, she was a school-age child. (T. 10.) C.L.G.'s alleged disability consists of attention deficit disorder ("ADD"). (T. 237.)

### B. Procedural History

On November 22, 2010, Plaintiff applied for Supplemental Security Income on C.L.G.'s behalf. (T. 63.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 13, 2012, Plaintiff appeared before the ALJ, F. Patrick Flanagan. (T. 531-570.)[1] A subsequent hearing was held on October 23, 2012 before ALJ Flanagan. (T. 31-39.) A third hearing was held on November 19, 2012 before ALJ Flanagan. (T. 40-70.) On January 11, 2013, ALJ Flanagan issued a written decision finding C.L.G. not disabled under the Social Security Act. (T. 10-25.) On August 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-4.) Thereafter, Plaintiff timely sought judicial review in this Court.

### C. The ALJ's Decision

---

[1] The record contains four hearing transcripts dated March 13, 2012 (T. 531-570), October 23, 2012 (T. 31-39), November 19, 2012 (T. 40-70), and March 13, 2013 (T. 73-99). The hearing transcript dated March 13, 2013 (T. 73-99) appears to be misdated as that transcript is identical to the transcript dated March 13, 2012 (T. 531-570). There was no hearing held on March 13, 2013.

Generally, in his decision, the ALJ made the following six findings of fact and conclusions of law. First, the ALJ found that C.L.G. was a "school-age child" at the time of filing and a "school-age child" at the time of the hearing pursuant to 20 C.F.R. § 416.926a(g)(2). (T. 13.) Second, the ALJ found that C.L.G. had not engaged in substantial gainful activity since the application date. (*Id.*) Third, the ALJ found that C.L.G. suffered from the severe impairments of attention deficit hyperactivity disorder ("ADHD"), chronic gastrointestinal inflammation, and estrophia of the left eye. (*Id.*) Fourth, the ALJ found C.L.G. did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I ("the Listings"). (T. 15) Fifth, the ALJ found C.L.G. did not have an impairment or combination of impairments that functionally equaled an impairment set forth in the Listings. (T. 15-25.) Sixth, and finally, the ALJ concluded C.L.G. had not been disabled, as defined by the Social Security Act, since November 22, 2010, the date her application was filed. (T. 25.)

## II.  THE PARTIES' BRIEFINGS

### A.  Plaintiff's Arguments

Generally, in support of her motion for judgment on the pleadings, Plaintiff makes two main arguments. First, Plaintiff argues the ALJ erred in the weight afforded to the medical and other opinion evidence in the record; and further, had the ALJ properly assigned weight to those opinions C.L.G. would have a "marked" limitation in the domains of attending and completing tasks, and acquiring and using information. (Dkt. No. 17 at 15-23 [Pl.'s Mem. of Law].) Second, Plaintiff argues the ALJ's credibility analysis was not supported by substantial evidence. (*Id.* at 23-25.)

### B.      Defendant's Argument

Generally, in support of her cross-motion for judgment on the pleadings,

Defendant makes two arguments.  First, Defendant argues substantial evidence

supported the ALJ's finding that C.L.G.'s impairments were not functionally equivalent to

any listed impairment.  (Dkt. No. 18 at 5-13 [Def.'s Mem. of Law].)  Second, Defendant

argues substantial evidence supported the ALJ's credibility determination.  (*Id.* at 13-

17.)

## III.     RELEVANT LEGAL STANDARD

A court reviewing a denial of disability benefits may not determine de novo

whether an individual is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v.

Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

Commissioner's determination will only be reversed if the correct legal standards were

not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*,

817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether

the ALJ applied correct legal principles, application of the substantial evidence standard

to uphold a finding of no disability creates an unacceptable risk that a claimant will be

deprived of the right to have her disability determination made according to the correct

legal principles."); *see Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v.

Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla,"

and it has been defined as "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.

Ct. 1420, 1427 (1971).  Where evidence is deemed susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

An individual under the age of eighteen (18) is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i). However, that definitional provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity...." 42 U.S.C. § 1382c(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability.

*See* 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, No. 02-CV-3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).

The first step of the test, which bears some similarity to the familiar five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then both statutorily and by regulation the child is ineligible for SSI benefits. *See* 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test next requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation. *See* 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. In essence, "a child is [disabled under the Social Security Act] if his impairment is as severe as one that would prevent an adult from working." *Zebley v. Sullivan*, 493 U.S. 521, 529, 110 S. Ct. 885, 890 (1990).

If the existence of a severe impairment is discerned, the agency must then determine, at the third step, whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Listings"). *Id.* Equivalence to a listing can be either medical or functional. *See* 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability and the twelve-month durational requirement

is satisfied, the child will be deemed disabled. *See* 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

Analysis of functionality is informed by consideration of how a child functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for [oneself]; and (vi) [h]ealth and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate

expectations) independently, appropriately, effectively, and on a sustained basis." 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## IV.    ANALYSIS

### A.    Opinion Evidence in the Record

### i.)    Treating Pediatrician, Maribel Quinones-Guzman, M.D.

The opinion of a treating source will be given controlling weight if it "is well
supported by medically acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §
416.927(c)(2).

The following factors must be considered by the ALJ when deciding how much
weight the opinion should receive, even if the treating source is not given controlling
weight: "(i) the frequency of examination and the length, nature, and extent of the
treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's
consistency with the record as a whole; and (iv) whether the opinion is from a
specialist." 20 C.F.R. § 416.927(c)(2). The ALJ is required to set forth his reasons for
the weight he assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996
WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting
*Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

C.L.G. established care with Dr. Quinones-Guzman in October of 2010.  (T. 375.)
At that time Plaintiff had concerns regarding C.L.G.'s behavior and requested screening
for ADD.  (*Id.*)  On November 12, 2010, Dr. Quinones-Guzman noted C.L.G.'s

Vanderbilt Assessment Scale was positive for ADD.  (T. 373.)[2]  Dr. Quinones-Guzman

prescribed C.L.G. Focalin.  (T. 374.)  On November 29, 2010, Plaintiff reported that

medication was "not working well," C.L.G. had trouble sleeping at night, was fidgety,

impulsive, and had trouble concentrating in school.  (T. 371.)  Dr. Quinones-Guzman

increased C.L.G.'s Focalin dosage and prescribed Clonidine to treat her insomnia.  (T.

371.)

At a follow up appointment on December 13, 2010, Plaintiff reported that

medication was still not working and C.L.G. still had trouble sleeping; however, Plaintiff

indicated C.L.G's concentration was "slightly better."  (T. 368.)  Dr. Quinones-Guzman

increased C.L.G.'s Focalin dosage.  (T. 369.)  On December 27, 2010, Plaintiff indicated

medication alleviated C.L.G.'s symptoms and she was doing better in school.  (T. 365.)

However, Plaintiff also indicated C.L.G. was not eating well and was aggressive with her

siblings.  (*Id.*)  Dr. Quinones-Guzman referred C.L.G. for psychiatric treatment and

increased her dosage of Clonidine.  (T. 366.)

On January 26, 2011, Plaintiff indicated Focalin relieved C.L.G.'s ADHD

symptoms.  (T. 363.)  Plaintiff expressed concerns regarding C.L.G.'s lack of appetite

and hand tremors.  (*Id.*)  Therefore, Dr. Quinones discontinued Focalin and prescribed

Vyvanse.  (T. 364.)  On March 18, 2011, Plaintiff indicated medication was not working;

however, she did not want her medication increased at that time.  (T. 352.)  Dr.

Quinones-Guzman's notation indicated C.L.G. was taking Concerta for her ADHD.  (T.

---

[2]        The Vanderbilt Assessment Scale is a questionnaire, often completed by parents and/or teachers, and is used to help healthcare professionals diagnose ADHD.  http://www.nichq.org/childrens-health/adhd/resources/vanderbilt-assessment-scales

353.)  It is not clear from the record when C.L.G. ceased taking Vyvanse and began taking Concerta.

On March 28, 2011, Plaintiff informed Dr. Quinones-Guzman that C.L.G. was less hyperactive with Concerta.  (T. 349.)  Dr. Quinones-Guzman increased C.L.G.'s dosage of Concerta.  (T. 350.)  On April 11, 2011, Plaintiff indicated the medication helped "a little" and "Concerta [was] working better," C.L.G. was less hyperactive, and was eating well.  (T. 346.)  On April 14, 2011, C.L.G. presented for a follow up appointment regarding her blood pressure.  (T. 344.)  Dr. Quinones-Guzman had concerns that Concerta caused an increase in C.L.G.'s blood pressure and began to wean her off of the medication.  (T. 345.)  On April 15, 2011, Plaintiff indicated she was weaning C.L.G. off of Concerta and C.L.G. was hyperactive and fidgety.  (T. 342.)  On April 22, 2011, notations indicated C.L.G.'s blood pressure was improving and no new medications were to be prescribed until C.L.G.'s blood pressure was normal.  (T. 341.)

On May 3, 2011, Plaintiff indicated C.L.G. was no longer taking Concerta, she was eating better, having trouble at school, had a poor attention span, was fidgety, and was moody at home.  (T. 338.)  Dr. Quinones-Guzman deferred prescribing medication until C.L.G.'s blood pressure returned to normal.  (T. 339.)  Plaintiff indicated she would contact the school regarding mental health counseling for C.L.G.  (*Id.*)  On May 6, 2011, Plaintiff indicated C.L.G. was hyperactive and fidgety without medication.  (T. 336.)  C.L.G.'s blood pressure was still elevated, so no new medications for ADHD were prescribed.  (T. 337.)  On May 27, 2011, Plaintiff indicated the school planned to evaluate C.L.G. for an individualized education program ("IEP") and she would repeat the first grade.  (T. 444.)

On July 6, 2011, C.L.G.'s blood pressure continued to be monitored and no new medications were prescribed for her ADHD. (T. 442-443.) On September 13, 2011, Plaintiff indicated C.L.G. was hyperactive and fidgety. (T. 439.) Dr. Quinones-Guzman placed C.L.G. back on Concerta. (T. 440.) On September 28, 2011, treatment notations indicated Plaintiff requested refills of Concerta, there were no notations regarding ADHD symptoms or effectiveness of medication. (T. 437.)

On October 6, 2011, Plaintiff indicated Concerta was "not working well." (T. 434.) Plaintiff also indicated C.L.G. cried easily in the afternoon, was impulsive, but was less aggressive. (*Id.*) Dr. Quinones-Guzman increased her dosage of Concerta. (T. 435.) On November 1, 2011, Plaintiff informed Dr. Quinones-Guzman that C.L.G. was not taking her medication because she ran out. (T. 431.)

On January 5, 2012, Plaintiff indicated C.L.G. was "doing well" in school and her behavior was "doing well" on Concerta. (T. 428.) On February 7, 2012, Plaintiff indicated C.L.G. was "doing better in school, grades have improved." (T. 425.) Dr. Quinones-Guzman decreased the dosage of Concerta. (T. 426.)

On January 8, 2012, Dr. Quinones-Guzman completed a "Childhood Disability Evaluation Form." (T. 405-406.) Therein, Dr. Quinones-Guzman opined Plaintiff had "extreme" limitations in the domains of: acquiring and using information; and, attending and completing tasks. (T. 405.) Dr. Quinones-Guzman opined Plaintiff had "marked" limitations in the domains of: interacting and relating with others; moving about and manipulating objects; caring for yourself; and, health and physical well-being. (*Id.*) The conclusion section of the form posed the question: "[d]oes the impairment or combination of impairments functionally equal the listings," to which Dr. Quinones-

Guzman checked the lines indicating: "yes – marked limitations in two domains" and "yes – extreme limitation in one domain." (*Id.*) Dr. Quinones-Guzman stated that C.L.G. "has a learning disability and [ADHD]; she has problems with aggressive behavior verbally, has trouble adjusting to new changes." (*Id.*) Of note, the form completed by Dr. Quinones-Guzman did not provide definitions of the terms used on the form nor an explanation of the various domains.

On February 21, 2012, Plaintiff reported C.L.G. was doing well, but was verbally aggressive towards her family. (T. 422.) On March 12, 2012, C.L.G.'s father reported she was doing better with medication, but had been without medication for two days. (T. 419.) C.L.G.'s medication dosage remained the same. (T. 420.)

On April 12, 2012, Plaintiff reported C.L.G. was "doing better in school" but had aggressive behavior at home. (T. 461.) Dr. Quinones-Guzman stopped Concerta and started C.L.G. on Strattera. (T. 462.) On April 26, 2012, Plaintiff reported C.L.G.'s ADHD was controlled with medication; however, C.L.G. was hyperactive on the current medication. (T. 464.) Dr. Quinones-Guzman did not alter C.L.G.'s dosage of Strattera. (T. 465.) On May 29, 2012, Plaintiff noted C.L.G.'s ADHD was alleviated by medication; however, Plaintiff indicated Strattera caused mood swings and the medication was "not working for her." (T. 467.) Plaintiff noted C.L.G. was hyperactive and fidgety. (*Id.*) Dr. Quinones-Guzman stopped Strattera and started C.L.G. on Metadate. (T. 468.)

On June 29, 2012, C.L.G.'s father indicated she was doing well on her current medications. (T. 472.) C.L.G.'s father reported her behaviors had improved, she was less hyperactive, but still hyperactive at times and fidgety. (T. 472.) Dr. Quinones-Guzman increased C.L.G.'s dosage of Metadate. (T. 473.) On August 8, 2012,

C.L.G.'s father reported her ADHD was "controlled" with medication and she was less hyperactive and fidgety. (T. 475.) On September 11, 2012, C.L.G.'s father made no complaints regarding her ADHD. (T. 478.) On October 12, 2012, Plaintiff indicated C.L.G.'s medication was on backorder. (T. 481.) Notations indicate C.L.G. was given Concerta. (T. 482.)

The ALJ afforded Dr. Quinones-Guzman's medical source statement "very little weight." (T. 18.) The ALJ reasoned Dr. Quinones-Guzman's opinion was "not consistent with the longitudinal medical and educational evidence in the record, including her own treatment notes." (*Id.*) Specifically, the ALJ provided examples from Dr. Quinones-Guzman's treatment notations which indicated C.L.G. was generally doing well on medication. (T. 18-19.)

Plaintiff argues the ALJ erred in selecting only the evidence that supported his weight conclusion because the ALJ's "sole focus" was on notations that C.L.G. did well on medication and ignored notations indicating C.L.G. was not doing well on medication. (Dkt. No. 17 at 17 [Pl.'s Mem. of Law].) Plaintiff further argues C.L.G.'s success with medication was directly countered in the record and additional evidence in the record supported a finding of at least "marked" limitations in the domain of acquiring and using information and in the domain of attending and completing tasks. (*Id.* at 18.)

An ALJ is entitled to resolve conflicts in the record, but his discretion is not so wide as to permit him to pick and choose only evidence that supports a particular conclusion. *See Smith v. Bowen,* 687 F.Supp. 902, 904 (S.D.N.Y.1988) (citing *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983)); *Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the [hearing officer] to simply pick and

choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims.").  Here, however, there was no indication ALJ impermissibly "cherry picked" the record.

In support of his decision to afford Dr. Quinones-Guzman's opinion "very little weight" the ALJ relied, in part, on the doctor's treatment notes.  Specifically, the ALJ highlighted inconsistencies between the medical source statement and notations indicating C.L.G. responded positively to medication.  (T. 19.)  On multiple occasions, C.L.G's parents indicated to Dr. Quinones-Guzman that her ADHD symptoms were responding to medication.  (T. 346, 349, 363, 365, 419, 425, 428, 461, 464, 467, 472, 475.)  Further, during a course of C.L.G.'s treatment, Dr. Quinones-Guzman stopped C.L.G.'s ADHD medication in order to assess her high blood pressure.  Around May 2011 to September 2011, C.L.G. was symptomatic while not on medication, as indicated in the record, thus indicating C.L.G. was responding positively to medication.. (T. 336, 338, 340, 342.)

To be sure, the record contains notations that C.L.G.'s was experiencing symptoms while on medication or that her medication was not alleviating all symptoms. As discussed in greater detail herein, treatment notations from November 29, 2010, December 13, 2010, January 26, 2011, March 18, 2011, and October 6, 2011 indicated that C.L.G.'s ADHD medication was not working and in response Dr. Quinones-Guzman either altered C.L.G.'s medication dosage or brand.  (T. 352, 354-355, 363-364, 371-372, 434-435.)[3]

_____

[3]    On March 18, 2011, Plaintiff wished to observer C.L.G. longer before increasing her medication.  (T. 352.)

In his discussion of Dr. Quinones-Guzman's medical source statement, the ALJ relied, in part, on her treatment notes indicating C.L.G.'s ADHD was "generally" well controlled with medication. (T. 18.) In addition, the ALJ stated in his weight analysis that Dr. Quinones-Guzman's medical source statement was inconsistent with the longitudinal medical and educational record. (*Id.*)

Although the ALJ did not expressly discuss notations in the record indicating that C.L.G.'s symptoms were not responding well to medication, "[a]n ALJ is not required to discuss in depth every piece of evidence contained in the record, so long [as] the evidence of record permits the Court to glean the rationale of an ALJ's decision." *LaRock ex. rel. M.K. v. Astrue,* No. 10–CV–1019, 2011 WL 1882292, *7 (N.D.N.Y. Apr. 29, 2011) (citing *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) (internal quotation marks omitted)). A review of the ALJ's decision indicated he took into consideration all of Dr. Quinones-Guzman's treatment notations. (T. 13-25.) The ALJ's decision cited to the exhibits which contained Dr. Quinones-Guzman's treatment notations; therefore, the ALJ was fully aware of Plaintiff's statements that medication was not always effective. (T. 18-19.) Further, there was no indication that the ALJ misread or misconstrued the record. The ALJ did not determine that C.L.G.'s symptoms were always controlled with medication or totally alleviated with medication, the ALJ held that Dr. Quinones-Guzman's records showed her symptoms were "generally" well-controlled, thus indicating the ALJ was aware that at times medication was not working optimally. (T. 18.)

Further, any error the ALJ may have made in failing to specifically mention notations of C.L.G.'s suboptimal treatment with medication was harmless. There is no

reasonable likelihood that remanding the ALJ's decision for a more thorough synopsis of Dr. Quinones-Guzman's treatment notes would change the ALJ's ultimate determination. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("Because the report that the ALJ overlooked was not significantly more favorable to Petitioner, we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that Petitioner was not disabled during the closed period. Accordingly, remand for consideration of the improperly excluded report is unnecessary.").

In addition, under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). After reviewing Dr. Quinones-Guzman's treatment notations, and specifically the treatment notes cited by Plaintiff, a reasonable factfinder could reach the ALJ's conclusion.

Therefore, the ALJ did not err in affording Dr. Quinones-Guzman's medical source statement "very little weight." The ALJ properly considered all of the doctor's treatment notes, even if he did not expressly discuss every notation, because the ALJ is not required to discuss every piece of evidence so long as the Court can glean his rational. Any error the ALJ may have made would be harmless, because the evidence cited in the record by Plaintiff would not have changed the ALJ's determination and the ALJ's determination was supported by substantial evidence.

### ii.) Teacher Opinions

The ALJ will consider evidence from "other sources" to show "severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." *See* 20 C.F.R. § 416.913(d).  Opinions from "other sources" can be "important and should be evaluated on key issues such as impairment severity and functional effects."  SSR 06–03p, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006).

Parents, teachers, and social workers are considered "other sources."  While their opinions cannot "establish the existence of a medically determinable impairment," they may be used as a means of providing insight into a child's degree of impairment and functional ability. SSR 06-03p, at *2 (citing 20 C.F.R. § 416.913(d)); *see also Reid v. Astrue,* No. 07-CV-577, 2010 WL 2594611, at *5, n. 4 (N.D.N.Y. June 23, 2010) ("While the opinions of educators and other non-medical sources are not entitled to controlling weight under the regulations, they are, nevertheless, deemed valuable sources of evidence in assessing impairment severity and functioning and should be considered by the ALJ.").

Opinions offered by teachers "should be evaluated by using the [20 C.F.R. § 416.927] factors," although "[n]ot every factor ... will apply in every case." SSR 06–03p, 2006 WL 2329939, at *5; *see also Bonet ex rel. T.B. v. Astrue,* No. 1:11-CV-1140, 2012 WL 3544830, at *7 (N.D.N.Y. Aug. 16, 2012).  The opinion of a "non-medical source," such as a teacher, may even "outweigh the opinion from a medical source," when the teacher "has seen the individual more often and has greater knowledge of the individual's functioning over time and if the [teacher's] opinion has better supporting

evidence and is more consistent with the evidence as a whole."  SSR 06–03p, 2006 WL 2329939, at *6.

Ms. Dengel, C.L.G.'s first grade teacher for the school year 2010/2011, competed a teacher evaluation on January 11, 2011.  (T. 255-262.) Ms. Dengel indicated C.L.G.'s current level of instruction in reading, math, and written language was at an early kindergarten level.  (T. 255.)  In the domain of acquiring and using information, Ms. Dengel opined C.L.G. had a "very serious problem" in the following areas: reading and comprehending written material; comprehending and doing math problems; and expressing ideas in written form.  (T. 256.)  Ms. Dengel opined C.L.G. had a "serious problem" in the following areas: learning new material, and recalling and applying previously learned material.  (*Id.*)

In the domain of attending and completing tasks, Ms. Dengel opined C.L.G. did not have a "very serious problem" in any areas of functioning.  (T. 257.)  Ms. Dengel opined C.L.G. had a "serious problem" in the area of completing work accurately without careless mistakes.  (*Id.*)  Ms. Dengel opined C.L.G. had "an obvious problem" in six areas, a "slight problem" in five areas, and "no problem" in one area.  (*Id.*)

Ms. Dengel opined C.L.G. had "no limitations" in the domain of interacting and relating with others.  (T. 258.)  Ms. Dengel opined C.L.G. had "no limitations" in the domain of moving about and manipulating objects.  (T. 259.)  Ms. Dengel opined C.L.G. had no limitations in the domain of caring for herself.  (T. 260.)  Ms. Dengel noted C.L.G. was "over a year behind academically, and absenteeism may be a factor."  (T. 261.)

Ms. Dengel completed another teacher evaluation in May of 2011.  (T. 278-285.)  Therein she opined C.L.G.'s current level of instruction was at mid-kindergarten for math and writing, and late-kindergarten for reading.  (T. 278.)

In the domain of acquiring and using information, Ms. Dengel opined C.L.G. had a "very serious problem" in the areas of: reading and comprehending written material; and, comprehending and doing math problems.  (T. 279.)  She opined C.L.G. had a "serious problem" in the areas of: expressing ideas in written form and learning new material.  (*Id.*)

In the domain of attending and completing tasks, Ms. Dengel opined C.L.G. had no "very serious problems."  (T. 280.)  She opined C.L.G. had a "serious problem" in completing class/homework assignments.  (*Id.*)  She opined C.L.G. had an "obvious problem" to "no problem" in the remaining areas of the domain.  (*Id.*)

In the domain of interacting and relating to others, Ms. Dengel only indicated C.L.G. had a "very serious problem" playing cooperatively with other children.  (T. 281.)  In the domain of moving about and manipulating objects, Ms. Dengel opined C.L.G. had a "slight problem" in all areas of the domain.  (T. 282.)

In the domain of caring for herself, Ms. Dengel wrote that she was concerned about C.L.G.'s ability to use good judgment and stated C.L.G. "seem[ed] very young for her age – very trusting and impulsive."  (T. 283.)

The ALJ afforded Ms. Dengel's evaluations, "some weight."  (T. 18.)  The ALJ reasoned Ms. Dengel's completed her two teacher questionnaires, before C.L.G. was classified for special education and services, and before she was "optimally treated" for ADHD and other complaints.  (*Id.*)

Plaintiff argues the ALJ erred in his assessment of Ms. Dengel's evaluations. (Dkt. No. 17 at 20 [Pl.'s Mem. of Law].) Specifically, Plaintiff argues the ALJ's reasoning was "not a proper basis for discounting her opinion," because C.L.G. was not "optimally treated" for her ADHD. (*Id.* at 20.) Plaintiff further argues, "the fact [C.L.G.] needed an IEP and special education indicates disability." (*Id.* at 20-21.) Defendant counters that the ALJ's reasoning was proper because C.L.G.'s ADHD was optimally treated and further an IEP does not equate disability. (Dkt. No. 18 at 11-12 [Def.'s Mem. of Law].)

First, Plaintiff's argument that C.L.G.'s need for an IEP indicates disability is misplaced. Although IEPs are "important sources of specific information about a child's abilities and impairment-related limitations, and provide valuable information about the various kinds and levels of support a child receives," SSR 09-2p clearly states "the underlying purpose of [an IEP] is not to determine disability under [the Administration's] rules." SSR 09-2P (S.S.A. Feb. 18, 2009). Therefore, under SSR 09-2p, Plaintiff's argument fails.

Second, Plaintiff argues the ALJ erred in his assessment of Ms. Dengel's opinion because C.L.G. was not "optimally" treatment of her ADHD. (Dkt. No. 17 at 20 [Pl.'s Mem. of Law].) Plaintiff's essentially argues that the ALJ erred in relying on Dr. Quinones-Guzman's notations indicating C.L.G.'s symptoms were generally well controlled by medication in affording weight to Ms. Dengel's evaluation. For the reasons stated herein, the ALJ properly assessed Dr. Quinones-Guzman's opinion and therefore, the ALJ did not err in relying on C.L.G.'s medical treatment in affording weight to Ms. Dengel's opinion.

Plaintiff argues the ALJ failed to properly evaluate the opinion of C.L.G.'s teacher, Jennifer Horn. (Dkt. No. 17 at 21 [Pl.'s Mem. of Law].) Ms. Horn was C.L.G.'s first grade teacher for the school year 2011/2012. (T. 306.)

Ms. Horn completed a teacher evaluation in March of 2012. (T. 299-306.) She opined C.L.G. was reading and doing math at a first grade level, but her written language was at a kindergarten level. (T. 299.)

In the domain of acquiring and using information, Ms. Horn opined C.L.G. had no "very serious" or "serious" problems. (T. 300.) In the domain of attending and completing tasks, Ms. Horn opined C.L.G. had no "very serious," "serious," or "obvious" problems. (T. 301.)

In the domain of interacting and relating with others, Ms. Horn opined C.L.G. had no "very serious," "serious," or "obvious" problems. (T. 302.) In the domain of moving about and manipulating objects, Ms. Horn opined C.L.G. had no "very serious," "serious," or "obvious" problems. (T. 303.)

In the domain of caring for herself, Ms. Horn opined C.L.G. had no "very serious" or "serious" problems. (T. 304.) Ms. Horn stated "without her medication, [C.L.G.'s] activity level greatly increases and attention decreases." (T. 305.)

Ms. Horn also wrote a letter dated May 16, 2012, outlining concerns regarding C.L.G.'s behavior. (T. 312.) Ms. Horn indicated C.L.G.'s academics were steadily improving since September; however, C.L.G.'s behavior deteriorated in April and May of 2012. (*Id.*) Ms. Horn did not provide any indication of a cause of C.L.G.'s deterioration. (T. 312-313.)

In affording Ms. Horn's opinion weight "some weight," the ALJ relied on Dr. Quinones-Guzman's opinion that C.L.G. was "doing well" on her ADHD medication. (T. 18.) For the reasons already stated herein, the ALJ did not err in his evaluation of Dr. Quinones-Guzman's opinion, nor did the ALJ err in his conclusion that her treatment notation indicated C.L.G.'s ADHD symptoms were "generally" controlled by medication. Further, as stated in Defendant's brief, the ALJ did not "discount" Ms. Horn's opinion but actually relied on Ms. Horn's opinion in concluding that C.L.G.'s limitations in the domain of acquiring and using information were less than marked. (Dkt. No. 18 at 12 [Def.'s Mem. of Law].) Therefore, the ALJ did not err in his evaluation of Ms. Horn's opinion.

### iii.)    J. Randall, Pediatrics and Denni Noia, M.D.

Plaintiff argues the ALJ erred in weighing the medical opinions of J. Randall, Pediatrics and Dennis Noia, M.D., specifically, the ALJ erred because he was "hypocritical." (Dkt. No. 17 at 21-22 [Pl.'s Mem. of Law].)

Dr. Noia opined on February 9, 2011, that C.L.G. could follow and understand many age appropriate directions; she could complete many age appropriate tasks; she could adequately maintain moderately appropriate social behavior; she could respond appropriately to changes in the environment; she could learn at her level of cognitive functioning; and she could ask questions and request assistance at slightly below an age appropriate manner. (T. 386.) Dr. Noia further opined, C.L.G. was capable of being aware of dangers and take precautions at slightly below an age appropriate level. (*Id.*) He opined, C.L.G. was capable of interacting moderately well with peers and

adults.  (*Id.*)  The ALJ afforded Dr. Noia's opinion "significant weight," reasoning it was consistent with the overall medical and educational evidence.  (T. 17.)

In February of 2011, Dr. Randall opined C.L.G. had "less than marked" limitations in the domains of: acquiring and using information; attending and completing tasks; caring for herself; and, health and physical well-being.  (T. 394-395.)  He opined C.L.G. had "no limitation" in the domains of: interacting and relating with others and moving and manipulating objects.  (*Id.*)  Dr. Randall based his opinion on evidence in the record at the time which included the consultative examiners' reports, educational records including Ms. Dengel's evaluations, and records from Dr. Quinones-Guzman through January 2011.  (T. 392-397.)

The ALJ afforded Dr. Randall's opinion "significant weight," reasoning it was consistent with the overall record, but not given "great weight" because it was provided prior to the receipt of all the evidence in the record.  (T. 17.)

It is well establish that an ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.*, No. 08-CV-1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010); *see* 20 C.F.R. §§ 416.912(b)(6), 416.913(c), and 416.927(f)(2); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y.Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").  Therefore, the ALJ's determination to afford weight to the consultative examiner and non-examining medical consultant was not

"hypocritical," but proper under the Regulations and case law and the ALJ was entitled to rely on their opinions in making his ultimate determination.

The ALJ's determination was supported by substantial evidence in the record. Plaintiff specifically argues that had the ALJ properly evaluated the opinion evidence in the record, C.L.G. would be found to have had a "marked" limitation in the domain of acquiring and using information and the domain of attending and completing tasks. (Dkt. No. 17 at 15 [Pl.'s Mem. of Law].) However, for the reasons stated herein, the ALJ properly afforded weight to the medical opinion evidence and teacher opinion evidence in the record. In making his determination that C.L.G. had less than marked limitations in the domain of acquiring and using information the ALJ relied on evidence provided by Ms. Dengel, Ms. Horn, Dr. Quinones-Guzman, Dr. Noia and Dr. Randall. (T. 19-20.) In making his determination that C.L.G. had less than marked limitations in attending and completing tasks, the ALJ relied on evidence provided by Dr. Quinones-Guzman, Dr. Noia, and Dr. Randall. (T. 20-21.) The ALJ properly evaluated all of the opinion evidence in the record according to 20 C.F.R. §§ 416.913(d), 419.927; further, the ALJ's determination was supported by substantial evidence in the record and remand is not recommended.

### B.    Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the

credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

"The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*, at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id., see* 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

The ALJ determined that C.L.G.'s medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, that statements concerning the intensity, persistence, and limiting effects of C.L.G.'s symptoms were not fully credible. (T. 16.) In making this determination the ALJ relied on C.L.G.'s IEP report dated March 23, 2012, teacher evaluations, and treatment notations from Dr. Quinones-Guzman. (T. 16-17.)

Plaintiff argues the ALJ erred in his credibility assessment because he based his determination on events that occurred after Plaintiff testified. (Dkt. No. 18 at 15 [Pl.'s Mem. of Law].) Defendant counters that the ALJ is entitled to weigh and consider all of the medical and non-medical evidence of the record, both prior to and after Plaintiff's hearing. (Dkt. No. 18 at 15 [Def.'s Mem. of Law].) The ALJ did not commit legal error in his credibility analysis because it was proper for the ALJ to take into consideration all of the medical and non-medical evidence of the record. *See* 20 C.F.R. 416.929(a) ("In evaluating the intensity and persistence of [Plaintiff's] symptoms, including pain, [the ALJ] will consider all of the available evidence, including [Plaintiff's] medical history, the medical signs and laboratory findings and statements about how [Plaintiff's] symptoms affect [Plaintiff.]").

Plaintiff essentially argues the ALJ erroneously "discredited" the whole of Plaintiff's testimony from March 13, 2012 based on a single IEP report dated March 30, 2012. (Dkt. No. 17 at 24 [Pl.'s Mem. of Law].) Plaintiff misconstrues the decision. The ALJ provided a synopsis of Plaintiff's testimony from all three hearings dated March 13, 2012, October 23, 2012, and November 19, 2012. (T. 16.) In evaluating Plaintiff's statements, the ALJ relied on the March 30, 2012 IEP; however, the ALJ also relied on

objective medical evidence and "other evidence" in the file in accordance with 20 C.F.R. § 416.929(c)(2)-(3), such as IEP reports, teacher evaluations, and medical records (T. 16-17.)  The ALJ conducted a proper and thorough credibility determination and remand is not recommended.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:          February 10, 2016

William B. Mitchell Carter
U.S. Magistrate Judge